AFFIDAVIT

I, John Manna, being duly sworn hereby depose and say:

**TRAINING AND EXPERIENCE**

      1.     I am an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

      2.     I am a Special Agent ("S/A") for the Drug Enforcement Administration ("DEA") and have been so employed for over 29 years. I am currently assigned to the DEA Panama City Resident Office. During my employment with the DEA, I have participated in approximately nine hundred and fifty (950) narcotics investigations, including physical surveillance, execution of search warrants, working in an undercover capacity, and arrests of numerous drug traffickers. I have spoken with more than 1000 defendants, confidential informants, and witnesses having extensive knowledge of the workings of major narcotics trafficking organizations. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with methods used by traffickers to smuggle and safeguard narcotics, distribute narcotics, and collect and launder related proceeds. I am aware of methods employed by major narcotics organizations to thwart any investigation of their illegal activities. During

my work as a Special Agent, I have working in an undercover capacity, where I have purchased illegal drugs, or negotiated for the purchase or sale of drugs, over 300 times. I have made thousands of undercover telephone calls and text messages, during which I conducted negotiations for the purchase or sale of drugs.

**THE OFFENSES**

3. This affidavit is made in support of an application for a warrant to search two cellular telephones—a LG Smartphone (hereinafter referred to as the "**Subject Telephone 1**") and an Alcatel flip phone (hereinafter referred to a "**Subject Telephone 2**") that were seized by law enforcement on September 2, 2020, from Mark Rensel Jr. ("Rensel"), and for which there is probable cause to believe said telephones were being used in violation of Title 21, United States Code, Sections 841 and 846.

4. This affidavit is also made in support of an application for a search warrant for one United Parcel Service (UPS) package (hereinafter referred to as the "**Subject Package**") currently in the custody of the Panama City Beach Police Department in Panama City Beach, Florida. As set forth herein, there is probable cause to believe that the **Subject Package** contains drug or other evidence which will prove violations of Title 21, United States Code, Section 841and 846.

5. The statements contained in this affidavit are based in part on information provided by Special Agents of the DEA and other law enforcement officers during

the below described criminal investigation and on my experience and background as a Special Agent of the DEA.  Since this affidavit is being submitted for the limited purpose of securing a search warrant for the **Subject Telephone 1, Subject Telephone 2,** and the **Subject Package,** I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish the necessary foundation for a Search Warrant for the **Subject Telephone 1, Subject Telephone 2,** and the **Subject Package**.

## DETAILED DESCRIPTION OF SUBJECT TELEPHONES AND PACKAGE

6.  **Subject Telephone 1** is further described as a LG smartphone, black and silver in color, which is currently in the custody of the Panama City Beach Police Department in Panama City Beach, Florida.

7.  **Subject Telephone 2** is further described as an Alcatel flip phone, black in color, with IMEI #015400000016233, which is currently in the custody of the Panama City Beach Police Department in Panama City Beach, Florida.

8.  The **Subject Package** is further described as a brown UPS cardboard box weighing approximately five pounds with listed sender as Karrisa Brown, 11568 Paula Avenue, Yuma, Arizona, 85367.  The **Subject Package** is addressed to Kenneth Brown, 120 N. Vista Stepanie Murray, Panama City Beach, Florida, 32413. The description of the goods is listed as "gift basket."   The package is currently in

the custody of the Panama City Beach Police Department in Panama City Beach, Florida.

## BACKGROUND OF INVESTIGATION

9.   On September 1, 2020, I received information from SA Kylabeth Kaz from the DEA office in Yuma, Arizona.  SA Kaz told me that on September 1, 2020, she located the **Subject Package** at a United Parcel Service ("UPS") station in Yuma, Arizona.  Based on her investigation, SA Kaz suspected that the **Subject Package** might contain illegal drugs.  The following is some, but not all, of the information provided by SA Kaz that she learned while conducting an investigation of the **Subject Package**:

a.  The **Subject Package** was dropped off by an unidentified female.

b.  The **Subject Package** was addressed to Kenneth Brown, 120 N. Vista Stepanie Murray, Panama City Beach, Florida, 32413.  SA Kaz noted that there was the name "Stepanie Murray" on the second address line of the shipping label.

c.  The **Subject Package** weighed approximately five pounds.

d.  The **Subject Package** cost $189.33 to be shipped from Yuma, Arizona, to Panama City Beach, Florida, and was paid by the unidentified female in cash.

e.  The employee at the shipping facility who assisted the unidentified female with the **Subject Package** told SA Kaz that when the unidentified female was asked the destination address for the **Subject Package**, the unidentified female retrieved a

piece of paper with the Florida address written on it. The employee stated the address seemed wrong because it had a name in the address and stated "120 N Vista Stepanie Murray". Additionally, the employee stated the piece of paper showed "120 N Vista Stepanie Murray PCB." The employee stated he asked the unidentified female what "PCB" stood for and the UF stated she did not know. The employee determined that PCB stood for Panama City Beach by cross checking the zip code.

10. I checked several databases and public information available on the internet for the address of 120 N. Vista, Panama City Beach, Florida, 32413, and determined that the address did not exist. It is my opinion that the address may have been confused with the address of 120 N. Vestavia Street, Panama City Beach, Florida. The following are some of the facts that I used to support my opinion:

a. I learned from a law enforcement database that on March 4, 2020, a deputy from the Bay County Sheriff's Office had a field interview with Stephanie Murray at 120 N. Vestavia Street, Panama City Beach, Florida.

b. On May 20, 2020, I was at 120 N. Vestavia Street, Panama City Beach, Florida, whilst assisting the Panama City Beach Police Department in a drug investigation. In the months prior to May 20, 2020, the Panama City Beach Police Department received several citizen's complaints about that location. The complaints claimed that the persons who resided at that location were engaged in the manufacture of methamphetamine. On May 20, 2020, agents and officers searched

that location, pursuant to consent from the residents, but did not discover any items that would substantiate the citizen's complaints.

    c.  On September 3, 2020, I spoke with a Panama City Beach Police Officer regarding the residence at 120 N. Vestavia Street, Panama City Beach, Florida.  The officer told me that she was familiar with location because that location was a known drug house.  The officer told me that it was her opinion based on conducting routine patrols in that area and speaking with citizens and informants that the residence at 120 N. Vestavia Street, Panama City Beach, Florida, was a location that drug users went to consume drugs.  The officer told me that she knew from conducting patrols in that area that Michael Vallani resided at 120 N. Vestavia Street and that on July 27, 2020, Michael Vallani overdosed from drugs at another residence on Vestavia Street.

Location and Detention of **Subject Package** at UPS facility in Lynn Haven, Florida

    11.  On September 1, 2020, I spoke with security officials at UPS regarding the **Subject Package**.  The security officials coordinated with the manager at the UPS facility in Lynn Haven, Florida, to have the package located.  On September 2, 2020, I, along with other agents met with the manager at the USP facility in Lynn Haven, Florida.  The manager located the **Subject Package** and placed the package among other UPS packages.  Police officer and K9 handler John Cain from the Lynn

Haven Police Department searched the area where the **Subject Package** was located using his narcotics canine "Brother."  After the search, Officer Cain told me that his canine "Brother" alerted to the **Subject Package** for the odor of narcotics.  Officer Cain has been a narcotics K9 handler for over four years.  He has handled other canines during those four year.  "Brother" is certified and is not trained to alert to marijuana.  Officer Cain has conducted over 50 free air sniffs using "Brother."

12.  After the search, the UPS manager gave custody of the **Subject Package** to the agents.

Arrest of Mark Rensel Jr. on September 2, 2020

13.  On September 2, 2020, agents went to 120 N. Vestavia Street, Panama City Beach, Florida, and had a consensual encounter with Mark Rensel.  During the encounter, agents discovered approximately one-half a gram of suspected methamphetamine and a needle used for injecting drugs in Rensel's pants pocket.  Local law enforcement officers arrested Rensel, charging him with possession of methamphetamine.  The following is a summary of this event:

a.  On September 2, 2020, at approximately 2:20 p.m., agents from the DEA and officers from the Panama City Beach Police Department went to 120 N. Vestavia Street, Panama City Beach, Florida.  As agents walked to the front door, Rensel could be heard speaking to someone that appeared to be a telephone conversation.  Rensel peered out the front window of the trailer.  SA David Fowler called out to

Rensel, asking him to come outside.

b.  SA Fowler saw Rensel walk towards the back of the trailer and then exit the rear door.  When the agent saw Rensel exit the back door of the trailer, Rensel was speaking to someone on **Subject Telephone 1**.  SA Fowler told Rensel that he (SA Fowler) wanted to talk to Rensel.  Rensel then walked towards SA Fowler.  SA Fowler asked him to come to the front of the trailer.  Rensel voluntarily walked to the front of the trailer and met with the agents.

c.  Rensel told the agents that he recently arrived in Panama City Beach, Florida, from Yuma, Arizona.  SA Fowler asked Rensel if he lived at that location. Rensel responded, "This is a flophouse.  I don't live here." Rensel said that he was visiting his friend Mike Vallani, who resided in the trailer.

d.  Rensel appeared very nervous and was constantly fidgeting and touching his pockets.  SA Fowler asked if agents could check Rensel to make sure Rensel did not have any weapons on him.  Task Force Officer (TFO) John Deegins then asked Rensel if he had anything on him that was illegal.  Rensel said that he had a "rig" and "dope" in his pants pocket. TFO Deegins asked Rensel what time of "dope" he had and Rensel responded, "speed."  I know from my experience that "speed" is a term used by drug users when referring to methamphetamine.  Rensel said that he also had a knife in his pocket.

e.  Agents then searched Rensel, pursuant to his consent, and retrieved a small

baggie containing approximately one-half of a gram of suspected methamphetamine and a hypodermic needle from Rensel's pants pocket.  Agents also seized **Subject Telephone 1,** which Rensel was holding in his hand, and **Subject Telephone 2,** which was found in Rensel's pants pocket.  Rensel was then placed under arrest and handcuffed.

f. SA Fowler asked Rensel if he had been previously arrested.  Rensel said that he had been arrested before.  SA Fowler asked Rensel if he was aware of his Miranda Rights to which Rensel answered, "yes, I know what my rights are."

g. While waiting for transportation, Rensel asked to speak to me in private.  I moved away from the other agents with Rensel.  Rensel asked me if he cooperated with the DEA and did three cases, would all charges be dropped against him.  I explained to Rensel that his suggestion was not possible.

h. I then asked Rensel several identifying questions such as his address, date of birth, and telephone numbers.  Rensel said he resided at 1357 E. La Mesa Street, Yuma, Arizona, and had a date of birth of September 25, 1978.  Rensel said that the telephone number assigned to **Subject Telephone 1** was 928-446-1884.  Rensel said that he did not know the telephone number for **Subject Telephone 2**.

i. Rensel was transported to the Panama City Beach Police Department.  Upon arriving at the police department, Rensel asked me a question with no solicitation. Rensel asked me if DEA had arrested someone in Arizona who was "snitching" on

him.

14. On September 2, 2020, while at the Panama City Beach Police Department, TFO Deegins and SA Fowler conducted a post-Miranda interview of Rensel. TFO Deegins read Rensel his constitutional rights. After reading Rensel his rights, TFO Deegins placed the Miranda rights form in front of Rensel to sign. Rensel looked at the form as if he was reading it, and said that he understood his rights. Rensel did not sign the Miranda form but instead began to talk to the agents. The following is some of the information that Rensel told the agents:

a. Rensel said that he flew into Panama City Beach, Florida, from Yuma, Arizona, last Tuesday or Wednesday.

b. Rensel said that Mindy Pasco picked him up at the airport and that he was staying a Mindy Pasco's residence in Panama City, Florida. Rensel said that he did not know Mindy Pasco's address.

c. Rensel said that he did not want to give agents consent to search **Subject Telephone 1** or **Subject Telephone 2** because someone may have planted incriminating information in the phones.

d. Agents showed Rensel the **Subject Package** and asked him if the **Subject Package** belonged to him. Rensel said that he did not know whether he should claim the **Subject Package** or not.

e. Rensel asked for a lawyer. The interview was then terminated.

15. After approximately 45 minutes, Rensel called out that he wanted to speak to someone. TFO Deegins and another investigator met with Rensel. Without solicitation, Rensel said, "I guess you opened it." Rensel said that he saw TFO Deegins with the box in the room. About 30 minutes earlier, TFO Deegins secured the **Subject Package** in an evidence locker. It was physically possible for Rensel to have seen TFO Deegins secure the **Subject Package**. Rensel asked how much "fed time" he was looking at.

16. Rensel was then transported to the Bay County Jail. During transport, Rensel told the officer to contact TFO Deegins and tell him that Rensel would confess to everything, if TFO Deegins would get Rensel released on his own recognizance.

17. In my experience as a law-enforcement officer, I have learned that people involved in the distribution and sale of drugs commonly use cellular telephones as a means to communicate. A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, cellular telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other

information on personal calendars; and accessing and downloading information from the Internet, such as package tracking, tracking numbers, and estimated times of package delivery. Based on my experience conducting narcotics investigations, I know that drug traffickers who move drugs through the mail, Federal Express, or UPS will track the package via the internet. Drug traffickers track the drug shipments through the internet for two purposes—to ensure they are nearby or at the delivery address when the package arrives, and to determine if there were any delays in the normal progression of the package, which could indicate that law enforcement has been alerted to the package. It is my opinion that there will be evidence that Rensel tracked the Subject Package on **Subject Telephone 1** or **Subject Telephone 2**.

18.    Based on my training and experience, I have learned that cellular telephone have the ability to store information in them for long periods of time. I know that people involved in the distribution and sale of drugs will often store names and numbers in the phone directory and speed dialing function of their phones. I have also learned that persons involved in such illicit activities commonly communicate with customers or sources of supply through the text or "SMS" system of their cellular telephone.

19.  I have also learned from my experience conducting drug investigations that drug traffickers can utilize more than one cellular telephone. This can be done

in an attempt to thwart law enforcement efforts to identify co-conspirators by telephone toll analysis. Traffickers can use one cellular phone to communicate with customers and another cellular telephone to communicate with suppliers. Another reason traffickers will utilize two cellular telephones is so that the trafficker can constantly use a different telephone numbers to contact their co-conspirators. This too is done in an attempt to thwart law enforcement phone exploitation efforts.

20. Specific to this investigation, by his own admission, Rensel has traveled from Yuma, Arizona, to Panama City Beach, Florida. It is my opinion that the **Subject Package** contains drugs that were being sent to Rensel. It is also my opinion that Rensel would communicate with the drug suppliers that sent the drugs to an address that Rensel would have had to communicate to the suppliers by an application on a cellular telephone.

18.  Based upon all of the information set forth in this Affidavit, there is probable cause to believe that evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (drug trafficking violations) will be found on the **Subject Telephones** and in the **Subject Package**.  These items and the evidence to be searched for and seized are specifically described in Attachments A and B respectively.

_____
John C. Manna
Special Agent
Drug Enforcement Administration


Sworn to and subscribed before me on this __4th__ day of September ____2020.


 /s/ Michael J. Frank
_____
Michael J. Frank
U.S. Magistrate Judge

## **ATTACHMENT A**

**Items to be Searched:**

**Subject Telephone 1** is described as a LG smartphone, black and silver in color, that was seized from Mark Rensel on September 2, 2020, which is currently in the custody of the Panama City Beach Police Department in Panama City Beach, Florida.

**ATTACHMENT B**

**Items to be searched for/seized from the cellular telephone described in Attachment A:**

All the text and/or SMS message content, message headers and/or footers; connection date and time; user name associated with the connection and other connection information, including Internet Protocol address of the source of connection; telephone caller identification records (e.g. – telephone numbers, contact lists, address books); voicemail messages on the telephone; text files, photographs/images, and videos; records of files or system attributes accessed, modified, or added by the user, and data pertaining to the devices to include IMSI (International Mobile Subscriber); ESN (Electronic Serial Number); IMEI (International Mobile Equipment Identity); and MEID (Mobile Equipment Identifier). In sum, all information retrievable by forensic examination of the cellular phones.